UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

---

DAISY RIOS,

                 Plaintiff,

       v.

BUFFALO AND FORT ERIE PUBLIC
BRIDGE AUTHORITY,

            Defendant.

---

<u>REPORT & RECOMMENDATION</u>

04-CV-375A

## <u>PRELIMINARY STATEMENT</u>

Plaintiff Daisy Rios ("Rios") has filed suit against her former employer, the

Buffalo and Fort Erie Public Bridge Authority (the "Authority"), under 42 U.S.C. §§ 1981 and

1983 and Title VII of the Civil Rights Act of 1964, codified at 42 U.S.C. § 2000(e), *et seq*.  Rios

alleges that throughout her sixteen-year employment with the Authority she was discriminated

against on the basis of race, color, national origin and gender.  (Docket # 15).  Currently before

this Court is the Authority's motion for summary judgment.  (Docket # 21).  For the reasons

discussed below, I recommend that the defendant's motion be granted in part and denied in part.

## <u>BACKGROUND</u>

The Authority operates and manages the Peace Bridge, which spans the Niagara

River between Buffalo, New York and Fort Erie, Ontario, Canada.  (Docket # 22 at ¶ 2).  The

Authority was created by legislative acts of New York, the United States and Canada, and its

1

governing board is comprised of representatives from New York and Canada.  (Docket # 26 at

¶ 2).  *See Mitskovski v. Buffalo and Fort Erie Pub. Bridge Auth.*, 435 F.3d 127, 129 (2d Cir.

2006).  Rios was hired by the Authority to work as a toll and traffic officer on September 6,

1989.  (Docket # 15 at ¶ 7).  The basic duties of a toll and traffic officer are twofold: to classify

vehicles and collect the appropriate toll (a toll officer), and to expedite the flow of vehicular and

pedestrian traffic crossing the bridge (a traffic officer).  (Docket # 22 at ¶ 3).  All toll and traffic

officers are expected to perform both sets of duties.  (Docket # 26 at ¶ 4 and Exhibit ("Ex.") A).

　　　　　Rios alleges that she suffered adverse employment actions because of her race,

color, national origin and gender.  Those actions took the form of suspensions and assignment to

purportedly less desirable tasks.  In addition, Rios claims that she was subjected to a hostile work

environment on the basis of her race and gender and that she was retaliated against for engaging

in protected activities.  (Docket # 15).  Each claim of discrimination is discussed below.

　　　　　A.  **Adverse Employment Action:**  The first adverse employment action of which

Rios complains occurred in 1998, approximately nine years after she was hired, and involved an

attendance-related suspension.  At the time, the Authority utilized a points-based attendance

policy.  Under the terms of the policy, an employee would accrue a specified number of points

for each attendance violation.  A total of ten points subjected the employee to termination.

(Docket # 22 at ¶¶ 23-24).

　　　　　On July 20, 1998, Rios traveled to New York City to care for her ill mother.  She

was unable to return home in time for work and asked her fiancé to call the Authority to inform

her supervisor of the situation.  Rios's fiancé did not make the call until after Rios's scheduled

shift had begun, and Rios was thus considered absent without authorization.  (Docket # 15 at

2

¶ 21).  Rios received five points for the violation, resulting in a total of ten points (she had received five points in May 1998 for failing to report for a scheduled shift) and warranting her termination under the policy.  (Docket # 22 at ¶ 26).  Following a discussion with Rios and her union, the Authority agreed to reduce the points applicable to Rios's July 20, 1998 offense to three and to suspend Rios from work for two weeks.  Rios thereafter filed a grievance with the union, and the three-point violation was rescinded, although her suspension was maintained.  (*Id.* at ¶ 28).

On September 22, 1999, the Authority issued revised disciplinary procedures (the "1999 Rules").  (*Id.* at ¶ 34).  The 1999 Rules eliminated the points-based system for attendance violations and instead listed specific offenses that warranted "progressive discipline" and those that warranted "immediate discharge."  (Docket # 26 at ¶ 15 and Ex. D).  According to the 1999 Rules, the new procedures were intended to be advisory and the Authority retained the discretion to determine on a case-to-case basis whether the circumstances surrounding a particular offense warranted more or less severe punishment than the Rules provided.  (*Id.* at ¶¶ 16-17, Ex. D).

Rios's second suspension occurred several years following the implementation of the 1999 Rules.  On February 5, 2001, Rios submitted a request to Operations Supervisor Marc Zucarelli to take a personal day on February 18, 2001.  Zucarelli denied the request because Rios had not accrued sufficient leave time to cover the absence.  Rios responded that she would "book sick" that day anyway – a comment which, according to Rios, she intended as a joke.  Rios called in sick on February 14, 2001, four days before the day she had initially requested.  By letter dated February 23, 2001, Rios was notified that she had been suspended for three days for taking sick

leave without permission and without providing medical documentation supporting the absence. (Docket # 15 at ¶ 21; Docket # 22 at ¶¶ 38-42).

According to Rios, a Caucasian male co-worker was disciplined less severely for the same violation. Specifically, Rios alleges that Don Henderson, another toll and traffic officer, received only a one-day suspension for failing to report for his scheduled shift on July 1, 2000, and for arriving late the following day. (Docket # 15 at ¶ 21; Docket # 22 at ¶ 43). On December 26 of that same year, Henderson was docked one day's wages for calling in sick two days earlier after his request for a personal day had been denied. (Docket # 22 at ¶ 43). Unlike Rios, Henderson had accrued sufficient leave at the time of his violations to cover his unexcused absences. (*Id.*; Docket # 26 at ¶¶ 19-20).

Rios was suspended from work for a third time on April 23, 2001, following an altercation she had with Zucarelli. (Docket # 15 at ¶ 22; Docket # 22 at ¶¶ 53-60). Rios was suspended for five days by Zucarelli for using abusive language and gestures during the argument. (Docket # 15 at ¶ 22; Docket # 22 at ¶ 63). Rios acknowledges the altercation, but denies using abusive language or taunting Zucarelli. Rios filed a grievance regarding the matter, and the Authority conducted an investigation, following which the suspension was upheld. (Docket # 22 at ¶¶ 64-67).

Rios also complains that minority toll officers were given less preferable work assignments than non-minority toll officers. Specifically, she alleges that minority officers often were assigned to work in busier toll lanes and were not relieved as often as non-minority operators. (Docket # 15 at ¶¶ 23-24; Docket # 22 at ¶¶ 100-06). Three minority co-workers have

submitted affidavits containing the same allegation of discriminatory treatment in job assignments.  (Docket # 36 at ¶ 5; Docket # 37 at ¶ 6; Docket # 40 at ¶ 12).

      **B.  <u>Hostile Work Environment</u>:**  Rios also alleges that she suffered discrimination in the form of a work environment hostile to Hispanics and women.  Her hostile work environment claim is based upon both specific incidents of harassment targeted against her and more generalized harassment of minorities.

      The first incident that Rios identifies as contributing to a hostile environment occurred shortly after she was hired by the Authority in 1989.  Rios, as a native of Puerto Rico and fluent in Spanish, occasionally spoke Spanish to motorists and co-workers.  Rios alleges that her supervisor at the time, Tommy Johnson, instructed her not to speak "Puerto Rican."  (Docket # 15 at ¶ 12; Docket # 22 at ¶¶ 6-8).  Rios never formally complained about the remark, nor was she ever disciplined for speaking Spanish at work.  (Docket # 22 at ¶¶ 8-9).  Two other Puerto Rican toll officers, Lisa Padilla and Eddie Santiago, have submitted affidavits stating that they too were instructed by Johnson to speak English and if they did not want to, they could go back to their country.  (Docket # 37 at ¶ 6; Docket # 40 at ¶ 6).

      The next specific incident occurred approximately six years later.  In 1995, Rios discovered a "pornographic cartoon" attached to the ceiling of a toll booth that she used.  (Docket # 15 at ¶ 15; Docket # 22 at ¶ 11).  The cartoon depicted a horse defecating and Rios's name was handwritten in the excrement.  The cartoon bore the caption, "There's one at every job site — a cunt."  (Docket # 34-3).  Rios suspected that a particular co-worker was responsible for the cartoon because he had used the same profanity to refer to her during an argument several days earlier.  Rios complained about the cartoon to the Authority's Human Resources Manager

Stanley Matthews and Facilities Manager David Young and informed them of the identity of the

co-worker she suspected.  (Docket # 22 at ¶¶ 12-13).

On February 1, 1995, Rios met with Matthews and Young regarding the incident.

During that meeting, Rios also complained that her lunch had been thrown in the garbage, that

someone had spit in her coffee cup, that "Puerto Rican scum" had been written on her car and

that her time card had been taken on multiple occasions.  (*Id.* at ¶ 14).  The Authority informed

Rios that her complaint would be investigated.  It thereafter interviewed the suspected

perpetrator, but ultimately failed to determine who was responsible for the cartoon.  (*Id.* at ¶ 18).

Six years later, shortly after her February 2001 three-day suspension, Rios was

subjected to another offensive cartoon.  This cartoon was placed in her locker in the women's

locker room.  The cartoon depicted a scantily-clad woman leaning into an automobile and

propositioning, "Give me back the 3 days.  I'll throw in a great Puerto Rican blow job."  The

words "Rios New Job" were handwritten across the top of the cartoon.  (Docket # 15 at ¶ 16, Ex.

C; Docket # 22 at ¶ 47; Docket # 33 at Ex. 7).  Rios reported the incident several months later on

May 25, 2001.  The Authority responded by placing tape over the louvers of Rios's locker and by

issuing a memorandum reminding all employees that sexually explicit material was prohibited in

the workplace.  (Docket # 22 at ¶¶ 50-52).

The next year, on May 7, 2002, racially offensive graffiti was discovered in a toll

booth.  (Docket # 15 at ¶ 17).  The graffiti stated, "Fuck the dumb spics."  (Docket # 37 at ¶ 9).

The graffiti was discovered by another Puerto Rican employee, Lisa Padilla, who reported it and

the Authority removed it.  (Docket # 22 at ¶ 72).  The following day the Authority issued a

memorandum reminding employees of its harassment policy and asking anyone with knowledge of the incident to come forward.  (Docket # 22 at ¶¶ 71-73).

In February 2003 Rios discovered another offensive cartoon in her locker – apparently a different locker from the one she had been using in 2001.  This one depicted two pigs fornicating, and Rios's first name had been written next to one of the pigs.  An American flag was drawn on the male pig's genitalia.  The cartoon contained a hand-written caption, "I'll give your neckbrace for a fuck."[1]  A similar cartoon was placed in Lisa Padilla's locker.  (Docket # 15 at ¶ 18, Ex. D; Docket # 22 at ¶ 74; Docket # 33 at Ex. 8).  Rios reported the cartoon to the general manager, who brought the matter to the attention of the facilities manager.  The facilities manager advised Rios that he would investigate the incident and take corrective action.  That same day another memorandum was issued to all employees reiterating the Authority's anti-harassment policy, a copy of which was attached to the memorandum.  Over the following ten days, fifty-two interviews were conducted as part of the investigation to ascertain who had been responsible for the offensive cartoons.  On April 24, 2003, Rios was notified that the investigation had failed to identify the perpetrator.  (Docket # 15 at ¶ 18; Docket # 22 at ¶¶ 76-83).

In addition to the specific incidents described above, Rios maintains that other more generalized forms of harassment occurred throughout her employment that contributed to a hostile work environment.  For example, she asserts that former Operations Supervisor Dominic Savarino repeatedly told ethnic jokes.  (Docket # 15 at ¶ 13; Docket # 22 at ¶¶ 84-88).  When she

---

[1] The previous day Rios's neckbrace had been removed from the location where she had left it; it was returned anonymously several hours later.  (Docket # 35 at ¶ 19).

first told him that she did not find his jokes amusing, he laughed and the jokes continued.  He

stopped only after she threatened to speak to another supervisor.  (Docket # 27, Ex. D at

pp. 140-43).  Lisa Padilla also affirms that she witnessed the ethnic joking described by Rios.

(Docket # 37 at ¶ 8).

   Rios claims that throughout the course of her employment she found pornographic

magazines and materials in the toll booths and often encountered pornographic programs being

played on a television in the supervisor's office.  As a toll booth operator, Rios was required to

spend time in both locations during her shift.  (Docket # 15 at ¶ 14; Docket # 22 at ¶¶ 89-99).

Other minority employees have submitted affidavits corroborating this alleged harassment and

the fact that it occurred repeatedly over a period of years.  (*See* Docket # 36 at ¶ 9; Docket # 37 at

¶ 11; Docket # 40 at ¶ 13).

   **C.  Retaliation:**  Rios also alleges that she was retaliated against in violation of

Title VII for engaging in protected activities, namely, for filing grievances and otherwise

complaining to the Authority about her perceived discrimination, as well as for filing a complaint

with the New York State Division of Human Rights.  She argues that the retaliation took the

form of the harassment described above.  In addition, she claims that shortly after she filed a

grievance in 1996, she discovered an anonymous note in her locker stating, "Don't waste your

time[.]  You are going to get yourself fired[.]  They are calling you Carolyn already."  (Docket

# 34-4).  According to Rios, "Carolyn" is an African-American employee who had been

terminated.  Rios does not know who wrote the note.  (*Id.* at p. 179).

## **DISCUSSION**

The Authority moves for summary judgment as to each of the claims set forth in
Rios's Amended Complaint.  (Docket # 21).  Rios opposes the motion, arguing that questions of
material fact exist that preclude summary judgment.  (Docket # 33).

## I.  **Standard for Summary Judgment**

Summary judgment is appropriate "if the pleadings, depositions, answers to
interrogatories, and admissions on file, together with the affidavits, if any, show that there is no
genuine issue as to any material fact and that the moving party is entitled to judgment as a matter
of law."  Fed. R. Civ. P. 56(c).  In reaching this determination, the court must assess whether
there exist any disputed material facts and, in so doing, must resolve all ambiguities and draw all
reasonable inferences against the moving party.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242,
248-49 (1986); *Coach Leatherware Co., Inc. v. AnnTaylor, Inc.*, 933 F.2d 162, 166-67 (2d Cir.
1991).

A fact is "material" only if it has some effect on the outcome of the suit.
*Anderson v. Liberty Lobby, Inc.*, 477 U.S. at 248; *Catanzaro v. Weiden*, 140 F.3d 91, 93 (2d Cir.
1998).  A dispute regarding a material fact is genuine "if the evidence is such that a reasonable
jury could return a verdict for the nonmoving party."  *Anderson*, 477 U.S. at 248; *see also Bryant
v. Maffucci*, 923 F.2d 979, 982 (2d Cir.), *cert. denied*, 502 U.S. 849 (1991).

The moving party bears the initial burden of demonstrating the absence of a
genuine issue of material fact, after which the nonmoving party must come forward with
sufficient evidence to support a jury verdict in its favor; the motion will not be defeated based

upon conjecture, surmise or the existence of "metaphysical doubt" concerning the facts. *Bryant v. Maffucci*, 923 F.2d at 982 (citing *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986)). The party seeking to avoid summary judgment "must do more than make broad factual allegations and invoke the appropriate statute. The [party] must also show, by affidavits or as otherwise provided in Rule 56 . . . , that there are specific factual issues that can only be resolved at trial." *Colon v. Coughlin*, 58 F.3d 865, 872 (2d Cir. 1995); *see also Driscoll v. Townsend*, 60 F. Supp. 2d 78, 80 (W.D.N.Y. 1999).

> As the Second Circuit has explained:
>
> [T]he trial court's task at the summary judgment motion stage of the litigation is carefully limited to discerning whether there are any genuine issues of material fact to be tried, not to deciding them. Its duty, in short, is confined at this point to issue-finding; it does not extend to issue-resolution. . . . It must be kept in mind that only by reference to the substantive law can it be determined whether a disputed fact is material to the resolution of the dispute.

*Gallo v. Prudential Residential Servs., Ltd. P'ship*, 22 F.3d 1219 (2d Cir. 1994).

In the case at bar, plaintiff's Amended Complaint asserts three causes of action. The first alleges race discrimination in violation of 42 U.S.C. § 1981. (Docket # 15 at ¶¶ 25-29). The second alleges race discrimination under 42 U.S.C. § 1983. (*Id*. at ¶¶ 30-34). The final cause of action alleges gender, race, color and national origin discrimination and retaliation, in violation of Title VII of the Civil Rights Act of 1964. (*Id*. at ¶¶ 35-40). For purposes of this motion, the Court turns first to the Title VII claim.

## II.  Title VII Discrimination Claims

Title VII of the Civil Rights Act makes it "an unlawful employment practice for an employer . . . to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individuals's race, color, religion, sex, or national origin."  42 U.S.C. § 2000e-2(a).  Rios's Title VII action alleges both race[2] and gender discrimination, and encompasses claims of disparate treatment, hostile work environment and retaliation.  Each will be discussed in turn.

**A.  Rios's Claims of Disparate Treatment:**  Rios's claims of disparate treatment based upon race and gender must be analyzed under the burden-shifting framework articulated in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973), and *Texas Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248 (1981).  Under that framework, the plaintiff bears the initial burden of establishing a case of discrimination.  If the plaintiff is able to satisfy this initial burden, the burden then shifts to the defendant to offer a legitimate, lawful reason for its action.  Once a lawful, non-discriminatory explanation is articulated, the burden returns to the plaintiff to prove that the defendant's reason is merely a pretext for discrimination.  *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 506-08 (1993).  Although the *McDonnell Douglas* analysis shifts the burden of production to the defendant, "[t]he ultimate burden of persuading the trier of fact that the defendant intentionally discriminated against the plaintiff at all times remains with the plaintiff."  *Texas Dep't of Cmty. Affairs v. Burdine*, 450 U.S. at 253; *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. at 507.

---

[2]  In her opposition papers, Rios uses the term race discrimination to encompass national origin and color discrimination.  (*See* Docket # 42 at 20-21).  This opinion also uses the term race discrimination broadly to include discrimination on the basis of race, color and national origin.

In order to satisfy her initial burden, Rios must establish a *prima facie* case of discrimination. To do so under Title VII, a plaintiff must show that: "(1) [s]he belonged to a protected class; (2) [s]he was qualified for the position; (3) [s]he suffered an adverse employment action; and (4) the adverse employment action occurred under circumstances giving rise to an inference of discriminatory intent." *Terry v. Ashcroft*, 336 F.3d 128, 137-38 (2d Cir. 2003) (citing *Collins v. New York City Transit Auth.*, 305 F.3d 113, 118 (2d Cir. 2002)). "An 'adverse employment action' is one which is 'more disruptive than a mere inconvenience or an alteration of job responsibilities.'" *Id.* (quoting *Galabya v. New York City Bd. of Educ.*, 202 F.3d 636, 640 (2d Cir. 2000)).

With respect to the three challenged suspensions, the Authority concedes that Rios has satisfied the first three elements of the required *prima facie* showing. I agree that Rios has come forward with sufficient evidence to establish that she is a member of a protected class by virtue of her gender, race and national origin, she was qualified to perform the job of a toll and traffic operator and her suspensions constituted adverse employment actions.

The parties' position diverge, however, on the question whether Rios has made an adequate showing as to the fourth element. To establish the final element of a *prima facie* case of discrimination – that the alleged adverse action occurred under circumstances giving rise to an inference of discrimination – a plaintiff must show that she was treated differently from "similarly situated" employees not of her protected class. *Shumway v. United Parcel Serv., Inc.*, 118 F.3d 60, 64 (2d Cir. 1997) (citing *Mitchell v. Toledo Hosp.*, 964 F.2d 577, 582 (6th Cir. 1992)). "To be 'similarly situated,' the individuals with whom [the plaintiff] attempts to compare herself must be similarly situated in all material respects." *Id.*

12

I find that Rios's showing on the fourth element fails.  Like the plaintiff in *Shumway*, Rios's allegations of disparate treatment are "little more than conclusory statements of no probative value."  *Id.* at 65.  The female plaintiff in *Shumway* was terminated from her supervisory position for violating the company's "no fraternization" policy.  The plaintiff filed suit under Title VII, alleging that "numerous male supervisory employees violated the [no fraternization] policy ... and no disciplinary action was taken against these employees."  *Id.*  The Second Circuit affirmed summary judgment for the defendant on the Title VII claim, finding that "such sweeping allegations [were] unsupported by admissible evidence [and did] not raise a genuine issue of material fact."  *Id.* (citations omitted).

Like the plaintiff's claims in *Shumway*, Rios's allegations of disparate treatment are based principally upon conclusory and generalized assertions that Caucasian and/or male employees were disciplined more leniently than she.  Other than describing the details of her own discipline, Rios has offered very few details relating to the discipline of other workers to support her conclusory allegations.  Indeed, Rios had identified only three Authority employees who she believes were treated more favorably than she for attendance violations: Don Henderson (a Caucasian male), Jen Ulewski (a Caucasian female) and Dan Murrett (a Caucasian male).  As to Henderson, the record indicates that he was not "similarly situated" because he, unlike Rios, had accrued sufficient leave to cover his absences at the time of his violations.  (Docket # 22 at ¶ 43; Docket # 22, Ex. 10 (D002095); Docket # 26 at ¶ 19; Docket # 49 at ¶¶ 18-20).  As to Ulewski, the record shows that she was disciplined more harshly than Rios for failing to show up for work because she lost pay in addition to accruing five points under the points system.  (Docket # 26 at ¶ 14).  Finally, as to Murrett, while the record shows that he was disciplined for attendance

violations, Rios has not shown that he was similarly situated to her, that is, that his violations were similar, that his past record of violations was similar or that he also lacked sufficient leave to cover his absences.  (*See* Docket # 42 at 10 and Docket # 26 at ¶ 19).  Moreover, the record reveals numerous instances during Rios's tenure in which other minority employees were disciplined less harshly than Rios for attendance problems and non-minority employees were disciplined more harshly, including one instance in which a Caucasian male was terminated for attendance violations.  (Docket # 26 at ¶¶ 14, 19, 21).

With respect to her third suspension, which followed the altercation with her supervisor, it too fails at this stage.  As with the first two suspensions, Rios has come forward with insufficient competent evidence from which to infer that she was treated differently from other similarly-situated employees.  Again she has failed to point to any specific evidence of similar altercations between other officers and their supervisors, let alone evidence that they were disciplined less severely than she for such an argument.[3]

Moreover, Rios herself admits that she believed that her supervisor was motivated to suspend her, not by gender or racial bias, but by personal animus arising from the fact that his wife had a pre-marital relationship with Rios's son.  (Docket # 42 at 12).  Indeed, when Rios complained about her suspension to the Authority's Human Resources Manager, she complained that she was treated unfairly as a result of this personal animus, not because of discriminatory bias.  (Docket # 26 at ¶ 25, Ex. F).  To the extent that she now argues that the decision by other

---

[3]  Rios alleges that her supervisor, Zucarelli, had an altercation with another toll officer, Don Henderson, in which the officer swore at Zucarelli.  (Docket # 35 at ¶ 42).  The Authority investigated the incident and interviewed both Henderson and Zucarelli, as well as two potential witnesses.  None remembered such an argument.  (Docket # 26 at ¶ 28).

managers to uphold the suspension was motivated by gender or race, there is simply no evidence in the record to support such a bald assertion.

Finally, her claim relating to discrimination in job assignments fails for similar reasons: the supporting allegations are insufficiently particular to withstand summary judgment. In its entirety, the claim rests upon conclusory allegations made in affidavits submitted by three minority co-workers that minority employees (apparently Hispanic and African-American employees) were assigned to busier toll lanes and relieved less often than non-minority employees. (Docket # 36 at ¶ 5; Docket # 37 at ¶ 13; Docket # 40 at ¶ 12). Despite a combined work history with the Authority of over eighty years, none of these affiants, nor Rios, has cited any specific evidence demonstrating that relief breaks afforded to minorities were less generous than those afforded to non-minority employees; indeed, it is far from clear that any records documenting relief breaks were made or maintained. Similarly, no specific information has been offered to show that certain toll lanes were busier than others,[4] let alone that minorities were assigned more often to such lanes. Again, it is unclear whether any documentary evidence of either exists. In sum, even accepting that a Title VII claim may be predicated upon evidence of disparate treatment in toll and traffic assignments, *cf. Harrison v. New York City Off-Track Betting Corp.*, 2001 WL 1154691, *3 (S.D.N.Y. 2001) (citations omitted) ("[i]t is well-established that subjective dissatisfaction with assignments does not constitute adverse employment action"), Rios's claim is simply too conclusory and speculative to withstand

---

[4] I find that the recollection offered by Wanda Watts that car lanes five and six from Canada "were usually busier than other lanes" is simply too speculative to give rise to a Title VII claim, particularly where it is unaccompanied by competent proof that Watts and other minorities were more frequently assigned than non-minorities to work in those lanes.

summary judgment.  *See Miller v. Saint-Gobain Advanced Ceramics Corp.*, 2004 WL 941798,

*5 (W.D.N.Y. 2004) (granting summary judgment to defendant on Title VII claim of disparate

treatment in job assignments).

Accordingly, for the reasons discussed above, I recommend that the Authority's

motion for summary judgment should be granted as to Rios's Title VII claim based upon

disparate treatment in discipline and job assignments.

**B.  Rios's Claim of a Hostile Work Environment:**  I next turn to Rios's claim of

a hostile work environment based upon race and gender.  To establish a claim for a hostile work

environment under Title VII, a plaintiff must demonstrate that the workplace was "permeated

with discriminatory intimidation, ridicule, and insult that is sufficiently severe or pervasive to

alter the conditions of the [plaintiff]'s employment and create an abusive working environment."

*Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21 (1993) (citations omitted).  Whether the challenged

conduct is sufficiently severe or pervasive requires a showing that it was both objectively hostile

or abusive – that is, that it created "an environment that a reasonable person would find hostile or

abusive"– and that it was subjectively perceived by the employee to be hostile or abusive.  *Id.*

Finally, the plaintiff also must demonstrate "a specific basis for imputing the conduct creating the

hostile work environment to the employer."  *Feingold v. New York*, 366 F.3d 138, 150 (2d Cir.

2004) (citation omitted).  As discussed more fully below, whether the conduct was perpetrated by

a supervisor or a co-worker is relevant to this issue.

Determination of whether a workplace was hostile requires the court to "look at

all the circumstances including the frequency of the discriminatory conduct; its severity; whether

it is physically threatening or humiliating or a mere offensive utterance; and whether it

16

unreasonably interferes with an employee's work performance." *Faragher v. City of Boca Raton*, 524 U.S. 775, 787-88 (1998) (internal quotations omitted); *see Williams v. County of Westchester*, 171 F.3d 98, 100 (2d Cir. 1999) (citing *Harris v. Forklift Sys., Inc.*, 510 U.S. at 23). "[S]imple teasing, offhand comments, and isolated incidents (unless extremely serious) will not amount to discriminatory changes in the terms and conditions of employment." *Id.* at 788 (internal citation omitted). The conduct complained of by the plaintiff "must be more than episodic; [it] must be sufficiently continuous and concerted in order to be deemed pervasive." *Perry v. Ethan Allen, Inc.*, 115 F.3d 143, 149 (2d Cir. 1997) (quotation omitted); *see Demoret v. Zegarelli*, 451 F.3d 140, 149 (2d Cir. 2006) (citations omitted); *Holtz v. Rockefeller & Co., Inc.*, 258 F.3d 62, 75 (2d Cir. 2001). Nevertheless, even a single incident of harassment may be enough to create a hostile work environment. *Torres v. Pisano*, 116 F.3d 625, 631 (2d Cir. 1997) (citing *Tomka v. Seiler Corp.,* 66 F.3d 1295 (2d Cir. 1995).

The Second Circuit has cautioned that a "judge is not a hierophant of social graces." *Gallagher v. Delaney*, 139 F.3d 338, 347 (2d Cir. 1998). Thus, the question of whether a work environment is sufficiently hostile to constitute a Title VII violation is typically one of fact that should be reserved for the jury. *Holtz v. Rockefeller & Co., Inc.*, 258 F.3d at 75 (citing *Schwapp v. Town of Avon*, 118 F.3d 106, 112 (2d Cir. 1997)). *See also Richardson v. New York State Dep't of Corr. Serv.*, 180 F.3d 426, 437 (2d Cir. 1999) (hostile work environment claims are "especially well-suited for jury determination"). "On a motion for summary judgment, the question for the court is whether a reasonable factfinder could conclude, considering all the circumstances, that 'the harassment is of such quality or quantity that a reasonable employee would find the conditions of her employment *altered for the worse*.'" *Schiano v. Quality Payroll*

*Sys., Inc.*, 445 F.3d 597, 600 (2d Cir. 2006) (quoting *Whidbee v. Garzarelli Food Specialties,*

*Inc.*, 223 F.3d 62, 67 (2d Cir. 2000)).

   Applying the above-cited authority, I cannot find as a matter of law that no

reasonable factfinder could conclude that the conduct described by Rios was sufficiently severe

or pervasive to create a hostile work environment.  To be clear, I recommend that the Authority's

motion for summary judgment be denied both as to Rios's hostile work environment claim based

upon race and as to her claim based upon gender.

   The Authority argues that each claim must be separately analyzed, and when

considered apart from the other, each fails.  Although I agree with the basic proposition that a

sex-based discrimination claim must be founded upon proof of discrimination motivated by

gender rather than by race, it is equally clear that evidence of one type of discrimination may be

relevant to a claim of a different type of discrimination.  *See, e.g.*, *Feingold v. New York*, 366

F.3d at 151 ("allegations of racial animosity can nevertheless be considered by a trier-of-fact

when evaluating [] religion-based claim"); *Cruz v. Coach Stores, Inc.*, 202 F.3d 560, 572 (2d Cir.

2000) ("[g]iven the evidence of both race-based and sex-based hostility, a jury could find that

[perpetrator's] racial harassment exacerbated the effect of his sexually threatening behavior and

vice-versa").

   Even disregarding this evidentiary principle, Rios has described certain incidents

that, if proved, betray both racial and gender animus.  For example, two of the three cartoons

directed at her cut across racial and gender lines.  One depicted her as a prostitute offering a

"Puerto Rican blow job"; the other attributed her name to a crying pig being sexually violated by

18

another pig with a United States flag on his penis.  I also believe that reasonable jurors could

infer that the graffiti, "Fuck the dumb spics" targets Hispanic women in particular.

I agree with Rios that the posting of the three cartoons, each of which specifically

targeted her as the object, was the most offensive harassment she allegedly suffered.  Although

episodic in nature, the cartoon displays were egregiously offensive.  The cartoons, considered in

combination with the other evidence of racial harassment (*e.g.*, repeated ethnic jokes by a

supervisor, the direction by another supervisor to Hispanic employees not to speak "Puerto

Rican" and profane graffiti on a toll both) and sexual harassment (*e.g.*, frequent exposure to

pornographic television programs in the supervisor's office and pornographic material in the toll

booths), leads me to find that Rios has demonstrated the existence of genuine issues of severity

and pervasiveness of the alleged racial and sexual harassment.[5]  That jurors may reasonably

disagree on those issues precludes summary judgment.

The Authority also argues that summary judgment should be granted because Rios

has not demonstrated a genuine issue of material fact as to another element of her claim – the

existence of a specific basis to impute the challenged conduct to her employer, the Authority.

Although I perceive the issue to be a close one, I conclude that it too should be determined by a

jury.

Rios alleges that the harassment she suffered was perpetrated by both supervisors

and co-workers.  As to supervisors, she claims that one of her supervisors directed her and other

---

[5] Rios also alleges that minority applicants were denied employment or promotion by the Authority on the basis of race.  Rios conceded at oral argument that she herself lacks standing to raise any claim for failure to hire or promote.  Rather, she seeks to offer proof of discriminatory hiring and promotional practices as evidence of a hostile work environment.  Whether such evidence is properly admitted at trial will be determined by the district court.

Hispanic employees not to speak "Puerto Rican," that another told repeated ethnic jokes and that two supervisors frequently displayed pornographic television programs in a supervisor's office that she was required to enter on a daily basis. That this harassment allegedly was committed by supervisors provides the legal basis on which to impute liability to the Authority. *See*, *e.g.*, *Faragher v. City of Boca Raton*, 524 U.S. at 807 ("[a]n employer is subject to vicarious liability to a victimized employee for an actionable hostile environment created by a supervisor with immediate (or successively higher) authority over the employee"); *Burlington Indus., Inc. v. Ellerth*, 524 U.S. 742, 765 (1998) (same).

Vicarious liability for supervisor harassment may be avoided if the employer can prove that it "exercised reasonable care to prevent and correct promptly any sexually [or racially] harassing behavior and . . . the plaintiff employee unreasonably failed to take advantage of any preventive or corrective opportunities provided by the employer or to avoid harm otherwise." *Faragher*, 524 U.S. at 807; *Burlington Indus., Inc. v. Ellerth*, 524 U.S. at 765. The Authority maintains that it has proved as a matter of law the applicability of the *Faragher-Ellerth* affirmative defense. I disagree, finding that material issues of fact exist on that issue as well.

For example, although the record demonstrates that the Authority adopted an anti-harassment policy in 2000, the earlier policy adopted in 1996 applied only to sexual harassment. Much of the alleged racial harassment occurred prior to 2000. In addition, I believe that Rios has raised genuine issues regarding her failure to report supervisory harassment to other management employees. For one thing, if the evidence shows that management was aware that pornographic television shows were frequently displayed in the supervisor's office and did nothing to stop the practice, such evidence may be relevant to the reasonableness of Rios's decision not to report the

20

conduct.  For another, she states that she did not consistently complain about harassment because she perceived that similar complaints by others were unavailing.  In my view, the reasonableness of that explanation also should be put to the jury.

By contrast to harassment by supervisors, harassment by co-workers generally does not subject an employer to liability unless the plaintiff proves that management knew of or should have known of the hostile work environment and failed to take reasonable remedial action to stop the harassment.  *Distasio v. Perkin Elmer Corp.*, 157 F.3d 55, 65 (2d Cir. 1998).  "Factors to be considered in this analysis are the gravity of the harm being inflicted upon the plaintiff, the nature of the employer's response in light of the employer's resources, and the nature of the work environment."  *Id.*  No real dispute exists that management officials were aware of the harassment that Rios suffered as a result the three cartoon postings; indeed, she complained to supervisors about each one (albeit several months later in one instance), and the Authority investigated each incident.  I find that the reasonableness of the Authority's response to Rios's complaints is appropriately resolved by a jury, not by a judge at this stage.  A similar jury question exists with respect to the reasonableness of the Authority's response to complaints about pornographic magazines.  According to Lisa Padilla, a female co-worker, she complained to her supervisor, Marc Zucarelli, about pornographic materials in the workplace as early as 2000, but continued to find such material for approximately two years thereafter.  (Docket # 37 at ¶ 12).  A jury should be permitted to determine the reasonableness of the Authority's response to complaints about pornographic material.

In sum, on the record before the Court, I conclude that triable issues of fact exist as to both the severity and pervasiveness of the alleged sexual and racial harassment and the

reasonableness of imputing such conduct to the Authority.  Accordingly, I recommend denial of

the Authority's motion for summary judgment on Rios's Title VII hostile work environment

claim.

      **C.  Rios's Claim of Retaliation:**  The Authority argues that summary judgment is

warranted on Rios's retaliation because she cannot make out a *prima facie* case of retaliation.  To

do so, she must demonstrate that:

> (1) she engaged in a protected activity; (2) her employer was aware
> of this activity; (3) the employer took adverse employment action
> against her; and (4) a causal connection exists between the alleged
> adverse action and the protected activity.

*Schiano v. Quality Payroll Systems, Inc.*, 445 F.3d at 608 (citing *Treglia v. Town of Manlius*, 313

F.3d 713, 719 (2d Cir. 2002)).  No genuine dispute exists as to the first two elements.  As to the

third, although the Authority disputes that the harassment Rios describes constitutes actionable

discrimination, it does not dispute that a hostile work environment may constitute an "adverse

employment action" within the meaning of the third element.  *See id.*

      The parties' real dispute again centers on the last element of the showing

necessary to establish a *prima facie* case.  The Authority contends that Rios has failed to

demonstrate an adequate causal connection between the alleged harassment and her complaints

of discrimination.  I agree.

      That Rios complained about discrimination and sometime subsequent thereto

suffered harassment is not sufficient to make out a *prima facie* case of retaliation.  She must

come forward with some facts from which to infer that the harassment was undertaken *in*

*response* to her complaints, rather than simply because of racial or gender hostility.  *Id.*  The one

event to which she specifically points as evidence of retaliatory intent – the anonymous note placed in her locker warning her not to "waste her time" because "they are calling [her] Carolyn" (an African-American employee who was terminated) – is too attenuated from the other alleged incidents to supply the required causal connection.  The note was placed in her locker in 1996, and the next specific act about which she complains – an attendance-related suspension – did not occur until 1998, two years later.  *See, e.g., Treglia v. Town of Manlius*, 313 F.3d at 720 ("a close temporal relationship between a plaintiff's participation in protected activity and an employer's adverse actions can be sufficient to establish causation); *Cifra v. G.E. Co.*, 252 F.3d 205, 217 (2d Cir. 2001).  Nor do I find that Rios has alleged a sufficient causal connection between any other acts of protected activity and acts of alleged harassment.

On this record, I find that Rios has not and cannot satisfy the final element necessary to establish a *prima facie* case of retaliation.  Accordingly, I recommend that the district court grant the Authority's motion for summary judgment on Rios's retaliation claim.

## III.  Section 1981 and 1983 Claims

The Authority also argues that summary judgment is appropriate with respect to Rios's race discrimination claims under 42 U.S.C. §§ 1981 and 1983.  (Docket # 23).  I agree.

Section 1981 guarantees that "[a]ll persons within the jurisdiction of the United States shall have the same right . . . to make and enforce contracts . . . as is enjoyed by white citizens."  42 U.S.C. § 1981(a).  As recognized by the Second Circuit, "[t]his section thus outlaws discrimination with respect to the enjoyment of benefits, privileges, terms, and conditions of a contractual relationship, such as employment."  *Patterson v. County of Oneida*,

375 F.3d 206, 224 (2d Cir. 2004) (citing *Whidbee v. Garzarelli Food Specialties, Inc.*, 223 F.3d

at 68-69).  Section 1981 prohibits discrimination by nongovernmental actors and those acting

"under color of State law."  42 U.S.C. § 1981(c).

Section 1983 permits actions against a "person who, under color of any statute,

ordinance, regulation, custom, or usage, of any State . . . subjects, or causes to be subjected, any

citizen of the United States . . . to the deprivation of any rights, privileges, or immunities secured

by the Constitution and laws."  42 U.S.C. § 1983.  States are immune from liability for damages

under Section 1983 by virtue of the Eleventh Amendment.  Municipalities are liable only where

the violation resulted from a municipal custom, policy, pattern or practice; liability may not be

based on a theory of *respondeat superior*.[6]  *See Monell v. Department of Soc. Servs. of City of

New York*, 436 U.S. 658, 690-91 (1978).  Of course, the policy or custom "need not be contained

in an explicitly adopted rule or regulation," *Sorlucco v. New York City Police Dep't*, 971 F.2d

864, 870 (2d Cir. 1992), but may consist of practices that are so "persistent and widespread" that

they constitute a "custom or usage with the force of law."  *Patterson v. County of Oneida*, 375

F.3d at 226 (citing *Sorlucco v. New York City Police Dep't*, 971 F.2d at 870).  However, "before

the actions of subordinate [municipal] employees can give rise to § 1983 liability, their

discriminatory practice must be so manifest as to imply the constructive acquiescence of senior

policy-making officials."  *Sorlucco*, 971 F.2d at 871.

---

[6] This Court has been unable to find any authority addressing whether the Authority should be considered a municipal agency or a State agency.  The parties appear to treat it as a municipal agency, and the defendant does not contest the applicability of Sections 1981 and 1983 to the Authority.  This question is immaterial to my recommended disposition because I find that plaintiff's claims under these statutes should, in any event, be dismissed.

The Supreme Court has determined that the municipal policy requirement of Section 1983 applies with equal force to actions brought against municipalities pursuant to Section 1981. *Jett v. Dallas Indep. Sch. Dist.*, 491 U.S. 701, 735-36 (1989). *See Patterson v. County of Oneida*, 375 F.3d at 226 ("when the defendant sued for discrimination under § 1981 or § 1983 is a municipality . . .[,] the plaintiff is required to show that the challenged acts were performed pursuant to a municipal policy or custom"). On the record before me, although I conclude that Rios has adequately demonstrated a *prima facie* claim of hostile work environment, I conclude that such evidence falls well short of suggesting that such harassment resulted from or manifested any official policy, pattern, or practice of the Authority.

By her own admission at oral argument, Rios seeks to hold the Authority liable based upon repeated failures by the Authority to prevent race discrimination; in her view, those failures were so pronounced and frequent that they were tantamount to an official policy. *See Gierlinger v. New York State Police*, 15 F.3d 32, 34 (2d Cir. 1994). To prevail on this theory, Rios would have to demonstrate that the "need for action by the policymaker [was] so obvious that the failure to act [rose] to deliberate indifference." *Board of County Comm'rs of Bryan County v. Brown*, 520 U.S. 397, 418 (1997). Although I agree with Rios that the question of the *reasonableness* of the Authority's response to her complaints of harassments is sufficiently close to warrant submission to the jury, I do not believe that the question of *deliberate indifference* by those in policymaking positions is similarly close. The record reveals that complaints she made to the Human Resources Manager about the cartoons were investigated and addressed; when racially-offensive graffiti was discovered, it was promptly removed and a memorandum issued. In addition, Rios admits that she did not complain to any policymaker about the direction not to

25

speak "Puerto Rican" or the ethnic joking by another supervisor; nor has she demonstrated that either of these supervisors was in a policymaking position with the Authority.  For these reasons, I find that Rios cannot establish that the challenged racial harassment resulted from an official, custom, policy or practice.  Accordingly, I recommend granting the Authority's summary judgment motion as to Rios's claims under 42 U.S.C. §§ 1981 and 1983.

## CONCLUSION

For the foregoing reasons, it is the recommendation of this Court that the defendant's motion for summary judgment **(Docket # 21)** be **GRANTED in part** and **DENIED in part**.

_s/Marian W. Payson_\
MARIAN W. PAYSON\
United States Magistrate Judge

Dated: Rochester, New York\
September __7__, 2007

Pursuant to 28 U.S.C. § 636(b)(1), it is hereby

      **ORDERED**, that this Report and Recommendation be filed with the Clerk of the Court.

      **ANY OBJECTIONS** to this Report and Recommendation must be filed with the Clerk of this Court within ten (10) days after receipt of a copy of this Report and Recommendation in accordance with the above statute, Fed. R. Civ. P. 72(b), 6(a) and 6(e) and Local Rule 72.3(a)(3).

      The district court will ordinarily refuse to consider on *de novo* review arguments, case law and/or evidentiary material which could have been, but was not, presented to the magistrate judge in the first instance. *See e.g. Paterson-Leitch Co., Inc. v. Massachusetts Mun. Wholesale Elec. Co.*, 840 F.2d 985 (1st Cir. 1988).

      <u>**Failure to file objections within the specified time or to request an extension of such time waives the right to appeal the District Court's Order.**</u> *Thomas v. Arn*, 474 U.S. 140 (1985); *Small v. Secretary of Health and Human Servs.,* 892 F.2d 15 (2d Cir. 1989); *Wesolek v. Canadair Ltd.*, 838 F.2d 55 (2d Cir. 1988).

      The parties are reminded that, pursuant to Rule 72.3(a)(3) of the Local Rules for the Western District of New York, "written objections shall specifically identify the portions of the proposed findings and recommendations to which objection is made and the basis for such objection and shall be supported by legal authority." <u>**Failure to comply with the provisions of Rule 72.3(a)(3), or with the similar provisions of Rule 72.3(a)(2) (concerning objections to a Magistrate Judge's Decision and Order), may result in the District Court's refusal to consider the objection.**</u>

      Let the Clerk send a copy of this Order and a copy of the Report and Recommendation to the attorneys for the Plaintiff and the Defendant.

**IT IS SO ORDERED.**

                               *s/Marian W. Payson*
                                   MARIAN W. PAYSON
                             United States Magistrate Judge

Dated: Rochester, New York
        September __7__, 2007