UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

DAISY RIOS,

                              Plaintiff,

          v.                                         DECISION AND ORDER
                                                     04-CV-375A
BUFFALO AND FORT ERIE PUBLIC
BRIDGE AUTHORITY,

                              Defendant.


## INTRODUCTION

          Plaintiff Daisy Rios commenced this action on May 20, 2004, against

her former employer, defendant Buffalo and Fort Erie Public Bridge Authority

("Authority"), alleging violations of 42 U.S.C §§ 1981 and 1983, and Title VII of

the Civil Rights Act of 1964, 42 U.S.C § 2000e.  The defendant filed a motion for

summary judgment and the plaintiff filed papers in opposition.  This case was

referred to Magistrate Judge Marian Payson, pursuant to 28 U.S.C. § 636(b)(1).

          On September 7, 2007, Magistrate Judge Payson issued a report and

recommendation recommending that defendant's motion for summary judgment

be granted in part and denied in part.  Specifically, Magistrate Judge Payson

recommended granting the defendant's motion for summary judgment as to

plaintiff's Title VII disparate treatment and retaliation claims, and her claims under

§§ 1981 and 1983.  However, as to plaintiff's hostile work environment claim,

Magistrate Judge Payson recommended that summary judgment be denied.

          Defendant filed timely objections to the report and recommendation.

Plaintiff filed a response in opposition to the objections but to do not file her own objections.  The Court held oral argument on the defendant's objections on February 5, 2008.

## **DISCUSSION**

Pursuant to 28 U.S.C. § 636(b)(1), this Court must make a *de novo* determination of those portions of the report and recommendation to which objections have been made.  Upon a *de novo* review, and after reviewing the submissions and hearing argument from the parties, the Court hereby adopts Magistrate Judge Payson's recommendation to grant summary judgment in favor of the defendant as to plaintiff's disparate treatment, retaliation and §§ 1981 and 1983 claims, for the reasons set forth in the report and recommendation. However, for the reasons set forth herein, the Court finds that summary judgment should also be granted as to plaintiff's hostile work environment claim.

To prevail on her hostile work environment claim, plaintiff must establish two elements:  (1) that her workplace was permeated with discriminatory intimidation that was sufficiently severe or pervasive to alter the conditions of her work environment, and (2) that a specific basis exists for imputing the conduct that created the hostile environment to the employer.  *See Petrosino v. Bell Atlantic,* 385 F.3d 210, 221 (2d Cir. 2004);  *Mack v. Otis Elevator Co.,* 326 F.3d 116, 122 (2d Cir.), *cert. denied*, 540 U.S. 1016 (2003).

To establish the first element, plaintiff must show that "the workplace is permeated with discriminatory intimidation, ridicule, and insult that is sufficiently severe or pervasive to alter the conditions of [her] employment and create an abusive working environment." *Harris v. Forklift Sys., Inc.,* 510 U.S. 17, 21 (1993) (internal quotations and citation omitted); *see also Demoret v. Zegarelli,* 451 F.3d 140, 149 (2d Cir. 2006)**.**  Plaintiff must demonstrate "not only that she subjectively perceived the environment to be abusive, but also that the environment was objectively hostile and abusive." *Demoret,* 451 F.3d at 149.  Plaintiff can do this by showing either that a single incident was extraordinarily severe, or that a series of incidents were "sufficiently continuous and concerted" so as to have altered the conditions of her employment.  *See Cruz v. Coach Stores, Inc.,* 202 F.3d 560, 570 (2d Cir. 2000); *Demoret,* 451 F.3d at 149.  The Supreme Court has explained that:

> whether an environment is "hostile" or "abusive" can be determined only by looking at all the circumstances. These may include the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance.

*Harris*, 510 U.S. at 23.

Plaintiff alleges that she was subjected to harassment based upon her ethnicity (Hispanic) and gender.  The allegations underlying plaintiffs hostile work environment claim are set forth in Magistrate Judge Payson's report and

3

recommendation and briefly summarized here.[1]

In 1989, plaintiff and other Hispanic co-workers were told by then-supervisor Tommy Johnson not to "speak Puerto Rican" and that if they did not like that it, they could "go back to their own country." Plaintiff did not notify the Authority about these offensive comments.

In February 1995, plaintiff was the subject of an offensive anonymous cartoon.  Plaintiff complained about the cartoon to then-Human Resources Manager Stanley Matthews and Facilities Manager Dave Young.  She also claimed that around that same time, her time card was missing, someone had spit in her coffee, and someone had written "Puerto Rican scum" on her car while it was parked in a public parking lot.  Matthews advised plaintiff that her complaints would be investigated and that she should report any further incidents directly to him.  The Authority's investigation failed to uncover the perpetrator.  Nevertheless, the Authority issued a warning to the individual whom plaintiff believed to be responsible.

In February 2001, plaintiff was the subject of another offensive anonymous cartoon.  This cartoon was slipped into her locker. Plaintiff did not report the incident to the Authority until May 2001, three months later.  When she did, the Authority responded by issuing a letter of apology and by modifying her locker to seal up the louvers.  The Authority also issued a memorandum reminding employees that sexually explicit materials were prohibited in the workplace.

In 2002, one of plaintiff's co-workers discovered graffiti stating "Fuck the dumb spics" on a toll booth. Upon learning of graffiti, the Authority immediately removed it and issued a memorandum to all of its employees reiterating its and anti-harassment policy and warning that harassing behavior was punishable by termination.

In early 2003, plaintiff and a female co-worker named Lisa Padilla each received an offensive anonymous cartoon.  Upon learning of the cartoons, the Authority issued another memorandum reiterating

_____

[1]Some of plaintiffs allegations relate to solely to harassment based upon ethnicity while others relates solely to harassment based upon gender.   A few of the incidents, specifically the offensive cartoons, relate to both gender and ethnicity.

its anti-harassment policy and conducted an extensive investigation to determine who was responsible for the cartoons.  As part of the investigation, the Authority interviewed over 50 employees.  In April 2003, plaintiff was advised that the Authority was unable to identify the perpetrator or perpetrators of the anonymous offensive cartoons.

Plaintiff also claims that:  (1) her supervisor Dominic Savarino frequently told ethnic jokes; (2) she often found pornographic magazines that were left in the toll booths by co-workers; and (3) she frequently observed supervisors watching sexually explicit television channels in the Authority's office.

Upon consideration of both the severity and pervasiveness of the alleged harassment, the Court finds that the behavior complained of was simply too infrequent and episodic to constitute a hostile work environment.  Putting aside the sexually explicit magazines and television programs for a moment, plaintiff identified only about six specific instances of misconduct over a thirteen-year period of time.  The incidents consisted primarily of isolated offensive remarks, jokes and cartoons.  Because no single incident was sufficiently severe so as to alter the conditions of plaintiff's employment, *see Howley v. Town of Stratford,* 217 F.3d 141, 153 (2d Cir. 2000) ("Usually, a single isolated instance of harassment will not suffice to establish a hostile work environment unless it was 'extraordinarily severe.'"), plaintiff must show that the "series of incidents were sufficiently continuous and concerted [so as] to have altered the conditions of her working environment."  *Id*. (quotation omitted).  Although "[t]here is no fixed number of incidents that the plaintiff must endure in order to establish a hostile

work environment," *see Alfano v. Costello*, 294 F.3d 365, 369 (2d Cir. 2002), the circumstances in their totality must be of such a severity and character so as to alter plaintiff's ability to function in the workplace.  Plaintiff's allegations fall short of that standard.  While no doubt offensive, the conduct complained of occurred infrequently and sporadically over an extensive period of time.  Cases involving more incidents over a shorter time frame have been found insufficient for Title VII purposes.  *See id*, at 378-381 (finding five incidents of harassment over a four-year span insufficient and collecting cases)*; Celestine v. Petroleos de Venezuella SA,* 266 F.3d 343, 354 (5th Cir. 2001) (in a twenty-five-month period, eight incidents of alleged racial harassment not pervasive); *Black v. Zaring Homes, Inc.,* 104 F.3d 822, 823-24 (6th Cir. 1997) (in a four-month period, repeated sexual jokes, and at least five other sexually offensive remarks not sufficient); *Baskerville v. Culligan Int'l Co.,* 50 F.3d 428, 430-31 (7th Cir. 1995) (in a seven-month period, nine sexually offensive incidents insufficient); *Gobin v. New York City Health and Hosp. Corp*., 2006 WL 2038621 (S.D.N.Y. July 19, 2006) (three incidents offensive conduct over a two-year period was insufficient).

The case of *Petrosino v. Bell Atlantic*, 385 F.3d 210 (2d Cir 2004), is illustrative.   Like this case, Petrosino alleged that she was subjected to offensive comments, jokes, and drawings.  However, unlike the plaintiff in this case, Petrosino provided evidence suggesting that the "demeaning conversations. . . were . . . an accepted part of the *daily* work environment" and that she was

6

*"constantly* confront[ed] crude sexual graffiti," *id.* at 214 (emphasis added). Petrosino also provided evidence indicating that the abusive work environment interfered with her ability to perform her job.

In contrast, plaintiff Rios has identified only a handful of offensive cartoons, drawings, jokes and comments that occurred over a lengthy period of time. She identifies five offensive cartoons and one graffiti incident over an eight-year period (from 1995 to 2003). She also identifies an offensive statement made by her supervisor Tommy Johnson in 1989, and a handful of offensive jokes made by her supervisor Dominic Savarino. Plaintiff never complained about the Johnson or Savarino incidents, and admits that Savarino stopped making the jokes when she asked him to. Plaintiff's own allegations make clear that the cartoons, jokes and comments were sporadic in nature and did not amount to the kind of continuous and pervasive activity needed to establish a Title VII claim. Although plaintiff no doubt was offended by the comments and jokes, there is no evidence that they interfered with her ability to perform her job. When considering allegations of a hostile work environment, courts must be mindful that "Title VII is not a general civility code for employers. Simple teasing, offhand comments, and isolated incidents (unless extremely serious) will not amount to discriminatory changes in the terms and conditions of employment." *Holtz v. Rockefeller & Co.,* 258 F.3d 62, 75 (2d Cir. 2001)(internal quotations and citations omitted): *see also Cosgrove v. Sears, Roebuck & Co.,* 9 F.3d 1033, 1041-42 (2d

Cir. 1993) (finding offensive remarks made by male co-workers and anonymous note insufficient to state *prima facie* case of harassment).

Plaintiff makes other generalized allegations of offensive conduct that occurred during her tenure at the Authority.  For example, she alleges having witnessed sexually explicit television programs being watched in the supervisor's office by supervisors Domenic Savarino and Jim Graber and others, but did not identify when that conduct occurred and admits that she never complained about the activity.  The Authority disputes plaintiff's allegations and claims that it never subscribed to any sexually explicit television channels.  The Authority also points out that since Graber left the Authority in 1995 and Savarino of left in 2001, the conduct complained of must have occurred before 2001, which is several years before plaintiff filed her EEOC complaint.

Plaintiff also alleges finding pornographic magazines that had been left in toll booths by co-workers, but again fails to identify with specificity when this conduct occurred.  At least one affidavit submitted by plaintiff's co-worker in support of plaintiff's  motion indicates that no pornographic materials were found after 2002.  *See* Dkt. No. 37, at ¶12.  Other evidence indicates that the Authority dealt with this issue by advising employees that such materials were prohibited in the workplace, and by conducting daily rounds by supervisors throughout the facility to look for and remove objectionable materials.  Like the offensive cartoons and jokes, the viewing of sexually explicit magazines and television

programs appears to have been sporadic in nature, and appears to have ceased

several years before plaintiff filed her EEOC complaint.

After considering all of the circumstances underlying plaintiff's allegations

and the fact that much of the alleged harassing conduct had either occurred or

stopped several years before she filed her EEOC complaint, the Court finds that

the behavior complained about in this case simply does not amount to the type of

pervasive and continuous activity needed to establish a hostile work environment

claim.  Therefore, plaintiff has failed to satisfy the first element of her claim.

Even if the court were to find that the plaintiff's work environment was

permeated with discriminatory intimidation and harassment, plaintiff has failed to

satisfy the second element of her hostile work environment claim, that is, she has

failed to provide a basis for imputing the harassing conduct to her employer.

Employers are not automatically liable for harassment perpetrated by their

employees.  *See Burlington Indus., Inc. v. Ellerth,* 524 U.S. 742 (1998); *Faragher*

*v. City of Boca Raton,* 524 U.S. 775 (1998).  Where a hostile work environment is

created by non-supervisory co-workers, an employer's liability depends on the

plaintiff showing that the employer knew (or reasonably should have known)

about the harassment but failed to take appropriate remedial action. *See*

*Petrosino,* 385 F.3d at 225 *(citing Faragher v. City of Boca Raton,* 524 U.S. at

789).  In contrast, if the harassment is perpetrated by a supervisor with immediate

or successively higher authority over the employee, the employer will be liable for

9

the hostile work environment *unless* it establishes as an affirmative defense that

(a) it exercised reasonable care to prevent and correct promptly any harassing

behavior, and (b) the plaintiff employee unreasonably failed to take advantage of

any preventive or corrective opportunities provided by the employer or to avoid

harm otherwise.[2]  *Id.*

Plaintiff's allegations of harassment perpetrated by her supervisors are as

follows: (1) Tommy Johnson's admonishment in 1989 that the plaintiff should not

"speak Puerto Rican;" (2) Dominic Savarino's ethnic jokes; and (3) the viewing of

the sexually explicit television channels by supervisors in the Authority's office.

The Court finds that the defendant has established its affirmative defense as to

the alleged harassment by these supervisors.  The Authority had an anti-

harassment policy and conducted training for its employees on the subject,

including bringing in a prominent employment discrimination attorney to its office

in 2000 to conduct employee training.  The existence of the training and the anti-

harassment policy satisfies the first prong of the defendant's affirmative defense.[3]

---

[2]   An employer will also be liable for the supervisor's harassing behavior if that behavior "culminate[d] in a tangible employment action" against the employee.  *See Petrosino*, 385 F.3d at 225.   However, that analysis does not apply here because the plaintiff did not suffer a tangible employment action arising from the harassment.

[3]  According to the plaintiff, the anti-harassment policy that was in place *before 2000*, applied only to sexual harassment, not racial or ethnic harassment.  However, since the plaintiff is alleging the existence of a hostile work environment based upon activity occurring from 1989 until 2004, the Court finds it appropriate to consider *all* of the anti-harassment policies adopted by the defendant during that time period for the purpose of determining whether the defendant has established its affirmative defense.

As to the second prong, the Court finds that plaintiff unreasonably failed to take advantage of any preventative or corrective opportunities because she never complained about Johnson's comments, Savarino's jokes, or the viewing of the pornographic television channels.  Indeed, there is no evidence that management was ever made aware of this supervisor misconduct.

Likewise, as to the harassing behavior alleged to have been committed by plaintiff's co-workers, the Court finds no basis to impute that conduct to the Authority.  The co-worker misconduct consisted of: (1) the offensive anonymous cartoons and graffiti; and (2) the pornographic magazines found in toll booths. The evidence shows that when notified about the inappropriate cartoons, graffiti and magazines, the Authority responded by taking remedial measures. Specifically, when plaintiff complained about the pornographic cartoon 1995, the Authority responded by conducting an investigation to identify the person responsible.  Although the Authority was unable to determine the identity of the perpetrator, it did issue a warning to the person whom plaintiff believed to be responsible.

Six years later, when plaintiff discovered another offensive cartoon in her locker, the Authority responded by issuing a memorandum reminding employees that sexually explicit materials were prohibited.  The Authority also modified plaintiff's locker so as to prevent the materials from being inserted into it. Although plaintiff now complains that the modification was insufficient, there is no

11

evidence that any other inappropriate material was slipped into that locker after it was modified.

When the toll booth graffiti was reported to the Authority in May 2002, the Authority immediately removed the graffiti and issued a memorandum reiterating its anti-harassment policy and warning employees that such behavior was subject to discipline.

When the Authority was notified about pornographic magazines being found in toll booths, it responded by posting notice to employees advising them that such materials were prohibited and that anyone possessing them would be disciplined.  The Authority also instituted daily rounds by supervisors to look for and confiscate any inappropriate materials.

When plaintiff and Lisa Padilla received offensive cartoons in February and March 2003,  the Authority responded by conducting an extensive investigation, which included interviewing over 50 employees.  The Authority also issued a memorandum reiterating its anti-harassment policy and attached a copy of the policy for reference.  The fact that the investigation was unable to uncover the alleged perpetrator does not mean that the Authority's response was unreasonable.  Title VII is not intended to impose strict liability upon employers for offensive conduct by its non-supervisory employees.  Instead the Act requires that employers be held liable only where they fail to take appropriate remedial measures to prevent future acts of harassment or abuse.  Factors relevant to

12

assessing the reasonableness of an employer's remedial measures include:

> the amount of time that elapsed between the notice and remedial
> action, the options available to the employer, possibly including
> employee training sessions, transferring the harassers, written
> warnings, reprimands in personnel files, or termination, and whether
> or not the measures ended the harassment.

*See Carter v. Chrysler Corp.*, 173 F.3d 693, 702 (8th Cir. 1999)(internal citations omitted).

Here, the undisputed evidence shows that each time the Authority learned of inappropriate or offensive conduct by non-supervisory employees, it acted immediately by sending out memorandums reiterating its anti-harassment policy, conducting investigations to ascertain the perpetrator or perpetrators, and warning employees that such conduct will not be tolerated.  The Authority also instituted daily rounds to look for inappropriate material and conducted sensitivity training in 2000.  There is no evidence that the Authority encouraged, condoned, or even simply ignored the offending behavior.  Rather, it took prompt remedial measures.  It is the plaintiff's burden to prove that the defendant acted unreasonably in responding to complaints of co-worker harassment.  Plaintiff has failed to satisfy her burden.  Therefore, summary judgment is appropriate.

## CONCLUSION

In sum, the Court hereby adopts Magistrate Judge Payson's

13

recommendation to grant summary judgment in favor of the defendant as to plaintiff's disparate treatment, retaliation and §§ 1981 and 1983 claims, for the reasons set forth in the report and recommendation.  Additionally, the Court finds that summary judgment should also be granted to the defendant as to plaintiff's hostile work environment claim for the reasons set forth herein.

The Clerk of the Court is directed to enter judgment in favor of the defendant as to all of plaintiff's claims and to take all steps necessary to close the case.


SO ORDERED.

s/ *Richard J. Arcara*
HONORABLE RICHARD J. ARCARA
CHIEF JUDGE
UNITED STATES DISTRICT COURT

DATED:  March 7, 2008